IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>vs.<br><br>PAUL KENNER,<br><br>        Defendant. | 4:16CR3085<br><br>**MEMORANDUM, ORDER, AND FINDINGS PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 23(c)** |

I do not like the decision I make in this case. But my likes or dislikes, of course, are not relevant. My job is to apply the law whether I like it or not. When I do, I find and conclude that Paul Kenner is "guilty" of the four petty "crimes" set forth in the superseding information because he was negligent.

This decision follows a non-jury trial pursuant to the consent of the parties. It was tried over two days in North Platte, Nebraska. Briefs were subsequently submitted.

The prosecutor and the defense lawyer are among the best trial lawyers I have been privileged to observe. I thank them for their civility and professionalism and compliment them on their zealous advocacy.

**SUMMARY OF SUPERSEDING INFORMATION**

Condensed and summarized, the government alleges that Defendant, a Nebraska rancher, allowed 300 head of his cattle to graze on land of the Valentine National Wildlife Refuge (Refuge) without paying the required fee and that a motorized vehicle was used in the process. The United States Fish and Wildlife Service (USFWS) operates the Refuge. The Refuge is bordered on three sides by

Defendant's land, and he claims that his cattle entered the Refuge because of a faulty fence, which was to be maintained by the Refuge.

Specifically, the government has charged the defendant with:

(1) permitting 300 head of cattle to enter the Valentine National Wildlife Refuge without authorization;

(2) using a motorized vehicle on the Refuge;

(3) disturbing, injuring, and destroying plants on the Refuge; and

(4) conducting a commercial enterprise (cattle grazing) on the Refuge without authorization.

**RELEVANT STATUTES AND REGULATIONS**

A statute, [16 U.S.C. § 668dd(c)](#)—part of the National Wildlife Refuge System Administration Act of 1996—details prohibited and permitted activities on the lands that comprise the National Wildlife Refuge System, and it expressly provides: "No person shall disturb, injure, cut, burn, remove, destroy, or possess any real or personal property of the United States, including natural growth, in any area of the System . . . or enter, use, or otherwise occupy any such area for any purpose . . . ." The government claims that Kenner violated the statute in four ways. The government has also alleged a violation of [18 U.S.C. § 2](#), the aiding and abetting statute.

The penalty for one "who *knowingly* violates or fails to comply with any of the provisions of this Act or any regulations issued thereunder shall be fined under Title 18 or imprisoned for not more than 1 year, or both." 16 U.S.C. § 668dd(f)(1) (italics added). However, the penalty for one "who *otherwise* violates or fails to comply with any of the provisions of this Act (*including a regulation issued under*

*this Act*) shall be fined under Title 18 or imprisoned not more than 180 days, or both." 16 U.S.C. § 668dd(f)(2) (italics added).

The government proceeds only under (f)(2) of the penalty provision. Thus, it is relieved of proving a "knowing" violation beyond a reasonable doubt.

The regulations issued pursuant to the Act that Defendant is charged with violating provide as follows:

•50 C.F.R. § 26.21 (COUNT 1): Except as specifically authorized:

"No person shall trespass, including but not limited to entering, occupying, using, or being upon, any national wildlife refuge . . . ." 50 C.F.R. § 26.21(a).

"No unconfined domestic animals, including but not limited to . . . cattle, shall be permitted to enter upon any national wildlife refuge or to roam at large upon such an area . . . ." 50 C.F.R. § 26.21(b).

•50 C.F.R. § 27.31 (COUNT 2):

"Travel in or use of any motorized or other vehicles, including those used on air, water, ice, snow, is prohibited on national wildlife refuges except on designated routes of travel . . . ."

•50 C.F.R. § 27.51 (COUNT 3):

"Disturbing, injuring, . . . destroying, . . . or attempting to disturb, injure, . . . destroy . . . any plant or animal on any national wildlife refuge is prohibited except by special permit . . . ."

•50 C.F.R. § 27.97 (COUNT 4):

"[C]onducting a commercial enterprise on any national wildlife refuge is prohibited except as may be authorized by special permit."

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The defendant Paul Kenner is a rancher. He owns or leases around 22,500 acres of land, and he owns thousands of cattle. He has a stellar reputation for honesty among the ranchers and town folk in the relevant area. Some of his property abuts the Refuge.

Paul Kenner's sons ranch with him. One of his sons, Brandon Kenner, suffers from quadriplegia that impairs physical function from the chest down. It also impairs his arms and hands to some degree, although this young man can perform a variety of functions with his hands and arms. Indeed, and to his great credit, Brandon works hard on the ranch despite this severe impairment. He does so using an all-terrain vehicle called a "ranger."

All-terrain vehicles are ubiquitous in the Sandhills of Nebraska where the Refuge and the Kenner ranch are situated. Ranchers and Refuge workers use these vehicles to get around. Indeed, a USFWS law enforcement officer and other employees of the Service who looked into this case used these type of vehicles to drive across the Refuge and investigate this case.

Paul Kenner also employed a ranch hand during the relevant time. Wyatt Thompson, a raw-boned young fellow from Godley, Texas, worked on the Kenner ranch when the events occurred that resulted in the prosecution. He played a prominent part in the events that triggered the prosecution.

The 72,000-acre Valentine National Wildlife Refuge lies in the heart of the Nebraska Sandhills, a vast area of grass-blanketed sand dunes that flow across north-central Nebraska. Lakes and marshes in the valleys and prairie grasses in the

hills and meadows provide habitat for many kinds of wildlife. As we shall see, little lakes that wax and wane are common. Sometimes they dry up. The depth of the water of each such lake can rise or fall dramatically.

The Refuge uses cattle grazing as a part of the management practices that maintain the quality of the habitat. Persons holding permits are allowed to graze their cattle on the Refuge for limited periods of time after paying a fee. Typically, as in this case, some land will be "rested" for several years before cattle grazing is permitted again. But that can be a problem. Wildfires on the Refuge and surrounding lands in this part of Nebraska are not uncommon, particularly when the grass grows high.

Most of the land in the Refuge is fenced using barbwire fencing with four or five strands. Three-strand fence is sometimes used when the fence crosses a little lake. All the fencing is owned by the USFWS, and it is maintained by the Service or others at the direction of the Service.

In this case, we are concerned with the most eastern part of the Refuge. This is an area known as Unit 35(C). Below is an image of that part of the Refuge.



Paul Kenner freely admits, and he told the USFWS law enforcement officers as much during the investigation, that about 300 head of his cattle got into Unit 35C and probably were there for about 10 days[1], although he and his son Brandon promptly removed them on October 8, 2015, after the Refuge manager called him to inquire about whether Kenner's animals were on Unit 35C. Kenner testified that he was not aware that the animals were on Unit 35C at the time of the call, but when he checked that same day, he found them there and promptly removed them. Given my determination that Kenner was negligent, I make no determination of whether Kenner knew before the call that the cattle were on Unit 35C.[2]

Paul Kenner also freely admits that his ranch hand, Wyatt Johnson, put mineral tubs on Unit 35C, but both Kenner and Johnson testified that they did not know that the cattle were on Unit 35C at the time. Kenner simply instructed Johnson to put the mineral tubs with the group of cows that had just been pregnancy tested, and Johnson, understanding what cattle those were, went looking for those specific critters. One animal was prominent and easily identifiable, as it was a Longhorn, while the other cattle were Angus or Charolais. The young ranch hand found that particular group of cattle, drove his all-terrain vehicle through the gate, and placed the mineral tubs with the cattle and left. Johnson, who was subpoenaed from Texas by the defense, testified that he remembers no signs

---

[1] Kenner thought they must have been there about 10 days because these animals had been recently separated from their calves, pregnancy tested, and moved to an area north and east of the Refuge roughly 10 days before the telephone call.

[2] In late October of 2015, two USFWS law enforcement officers interviewed Kenner on a country road for about 20 minutes. It was cold and the wind was blowing hard. Consequently, they stood behind a pickup to get out of the wind as much as they could. Kenner has a rod in his spine and neck. He can barely turn his head and his manner while speaking is thus very awkward. He is also very soft-spoken. He can be difficult to hear. The law enforcement officers thought Kenner said he put the cattle on Unit 35C because he was worried that it was a fire hazard since the land had been "rested" too long. Kenner, on the other hand, takes the position that he may have said something about Unit 35C being a fire hazard, but vehemently denies admitting that he put the cattle on Unit 35C for any purpose. He suggests that the law enforcement officers conflated the two things. Both of the law enforcement officers were very credible. So was Kenner.

warning that he was entering the Refuge or that motorized vehicles were not permitted.

The gate on the south part of Unit 35C is clearly marked with three signs indicating that unauthorized entry was prohibited and that motorized vehicles were prohibited as well. On the other hand, Kenner testified that there is another gate on the northeast fence line of Unit 35C. That gate is depicted by a small hand-drawn blue circle on Ex. 2 on the northern-most portion of the eastern fence line. There is no evidence that this gate has any Refuge warning signs.

Although the USFWS employees did not testify about the existence of the gate, and while Ex. 2, as originally prepared by the government, shows no such gate, I believe Kenner. He clearly knows more about the area than any of the USFWS employees.[3] I believe Johnson entered Unit 35C through the gate shown by the blue circle driving an all-terrain vehicle. I also believe that Johnson would have noticed signs indicating the presence of the Refuge, but that he has no recollection of seeing such signs on the gate through which he entered.

How did the cattle get on Unit 35C? To answer that question, I refer again to Ex. 2 displayed above. On that exhibit, there is a second hand-drawn blue circle on the north part of the eastern fence line (but below the blue circle for the gate). That circle depicts a little lake that waxes and wanes.

Below is Ex. 138, and it depicts how that little lake looked in 2016 before it began to dry up.

---

[3] The government did not dispute the existence of the gate discussed by Kenner when it put on rebuttal evidence.



Notice that this fence has only three strands. Notice also that there is a fairly large gap between the bottom strand of barbed wire and the surface of the water.

Now consider Ex. 140. It shows (again in 2016) the relationship between the three-strand fence and water that has receded. Unit 35C is on the left of the photo behind the fence. The fence faces outward toward the Kenner ground on the right.



In October of 2015, I believe the cattle, driven by flies, which are abundant at that time of year, and facing into a relatively warm wind from the west[4], ducked their heads under the third strand and proceeded onto Unit 35C in an effort to avoid being tormented by the insects. After they had entered the Refuge, Wyatt Johnson found the cattle and unknowingly put out the mineral tubs on Unit 35C while driving an all-terrain vehicle through the gate shown by the handwritten blue circle on Ex. 2.

---

[4] Cattle face into a warm wind to cool themselves.

8

That the cattle had gone onto the Refuge in October or late September of 2015 should have been no surprise to Kenner. It had happened on Unit 35C at least twice before—once in 2012 and another time in 2014. One time, at least 30 head of Kenner's cattle got onto Unit 35C. On another occasion, at least 50 head of cattle entered upon Unit 35C. Despite these two events, Kenner told me that he never complained to the USFWS about the maintenance of the boundary fencing or advised the Refuge manager that he believed the three-strand fence was unsuitable.[5]

Once the cattle were on Unit 35C, they did what cattle do. At the very least, they "disturbed" the grasses. However, no lasting damage was done, and the grass returned to normal in 2016.

With the foregoing in mind, I now turn to the law as applied to these facts. There is no intent or knowledge requirement under the provisions of 16 U.S.C. § 668dd(f)(2) or the regulations charged here.

Given the fact that Kenner's cattle entered onto the Refuge, that the cattle consumed the grass on Unit 35C for about 10 days, that Kenner's cattle disturbed grass belonging to the Refuge, and that Kenner directed his ranch hand to drive an all-terrain vehicle that entered the Refuge[6], one could, with a straight face, conclude that Kenner was guilty of all four counts without further elaboration. In other words, one could conclude that Kenner was "strictly liable" for the criminal

---

[5] I inquired of Kenner myself regarding the facts presented in the paragraph to which this footnote is appended regarding the previous times his cattle got over into Unit 35C and whether he complained to the wildlife managers about inadequate fencing. One can access the exchange beginning at approximately 27:13 of the digital audio recording that appears as Filing No. 44.

[6] Kenner would be tagged for the ranch hand's use of the all-terrain vehicle on Unit 35C under the aiding and abetting statute. In short, the young man did what Kenner told him to do—find the cattle wherever they were and put out mineral tubs using the all-terrain vehicle.

violations because the statute and regulations do not require proof of knowledge or intent. But the law abhors strict-liability crimes.

I am not inclined to impose strict liability. After a thorough examination of the statutory scheme at issue here (§ 668dd(f)(2)), including the legislative history, and applying the precedents of the Supreme Court on statutes that are silent on a mens rea requirement, Judge Davila found Jeremy Best guilty of unlawfully entering the Don Edwards National Wildlife Refuge. *United States v. Best*, 2012 WL 3027544 (N.D. Cal. 2012). But Judge Davila *rejected* a strict-liability theory and instead insisted that the government prove simple negligence.

The judge reasoned:

> In the absence of a more instructive comment from Congress, the clarification of penalties between intentional and unintentional violations cannot be equated with differentiating between intentional and strict liability violations. *Semenza*, 835 F.2d at 224 ("Absent a clear indication of legislative intent, courts should be reluctant to dispense with a *mens rea* requirement."). At the same time, however, neither specific intent, general intent nor recklessness fits within the legislative history of § 668dd(f) and in particular Congress' use of "unintentional" to describe the class of violations punished under subsection (2) of § 668dd(f). In context, "unintentional" seems more akin to simple negligence, similar to that which is required to sustain a civil tort claim. That form of *mens rea* appropriately mediates between the congressional record and the traditional assumption that all crimes require some form of intent.

*Id.* at *5.

I agree with Judge Davila. The proper standard under § 668dd(f)(2) is "simple negligence such that the Government must prove 'an act which the actor as a reasonable man should recognize as involving an unreasonable risk of causing an

10

invasion of an interest of another.'" *Id.* (citing and quoting *Restatement (Second) of Torts* § 284 (1965).)

The government has proven that Kenner was negligent. He took an unreasonable risk of running his cattle operation adjacent to the Refuge, knowing full well that unless he was vigilant, each and every day his cattle could, as they had done twice in the recent past, stray onto Unit 35C as the water fell in the little lake. Yet he never complained to the USFWS about the maintenance of the boundary fencing or advised the Refuge manager that he believed the three-strand fence was unsuitable. Nor is there any evidence that he patrolled the area of the little lake on a regular basis to insure his animals remained on his ground. He simply continued with his cattle operation and took no significant[7] precautions to avoid the unlawful entry of his cattle upon Unit 35C.

The same is true with Kenner's handling of his ranch hand. He instructed the ranch hand to set out mineral tubs using an all-terrain vehicle, knowing full well that his cattle might be on Unit 35C as had happened twice before. In this case, Kenner simply told the ranch hand to find the cattle and deliver the minerals without any warning about the distinct possibility that Kenner's cattle might have wandered onto Unit 35C as they had done twice in the past. A reasonable person would have carefully cautioned his employee.

---

[7] One time, Kenner did repair one broken strand on a short piece of the three-strand fence that crossed the little lake. Other than that one repair, he went about his cattle ranching business ignoring the known risk.

11

## CONCLUSION

In sum, I find and conclude that Kenner is guilty of all four counts beyond a reasonable doubt. We will need a sentencing hearing. However, I see no need for a presentence report and I therefore waive it.[8]

In this regard, it is highly unlikely that Kenner will be sentenced to time in prison (or a period of probation[9]). Moreover, I am tentatively inclined to impose only a minimal fine (say, $100).

It is also unlikely that I would require Kenner to pay a large sum of money damages because his cattle grazed on Unit 35C for ten days or less. There is absolutely no credible evidence that the pasture was permanently damaged. Tentatively, I conclude that the prevailing rate charged by USFWS for permissive grazing during 2015 ($29.60) is the proper measure of damages (98.36066 AUM[10] x $29.60=$2,911.48) based upon 300 head of mature cattle[11] grazing for 10 days.[12]

---

[8] My research indicates that the crime at issue is not explicitly governed by the Sentencing Guidelines. *See* U.S.S.G. § 2Q2.1 (Guideline and commentary on "Conservation and Wildlife" listing statutes covered by the Guidelines and listing 16 U.S.C. § 668(a), but not listing the charging statute here, 16 U.S.C. § 668dd(c)) and Appendix A at page 576 (same) (citations are to the Manual in effect as of November 1, 2016).

[9] Indeed, I am not even sure that probation is authorized under the relevant statute or otherwise.

[10] An "AUM," when used in the context of federal grazing lands, is the amount of forage needed to sustain one cow and her calf for a month.

[11] The government alleged 300 cattle in the amended information, so I reject the government's attempt to increase the number to 400 based upon the eyeball estimate of an USFWS employee.

[12] Exhibit 22 and related testimony reflect basic calculations. These calculations were completed by a USFWS employee with expertise in Refuge grazing and AUMs.

Kenner will also be responsible for the reasonable costs of the investigation. *See* 50 CFR 28.42(g) ("The salary of Service employees for the time spent in and about the investigations, reports, and settlement or prosecution of the case shall be prorated in computing the expense."). In total, the government is seeking $5,668.44 (Ex. 23) *plus* additional amounts for five USFWS employed who traveled to and from trial and who attended trial.

Importantly, because no contemporaneous time records were put into evidence, I have reservations about the accuracy of the summary appearing as Ex. 23. For example, I find it hard to believe that Mr. Geis actually spent two hours sending two or perhaps three e-mails, or that it took him one hour to review two e-mails. Without contemporaneous time records (like a lawyer's time slip, made in the regular course of business at or about the time of the event), I am probably not inclined to give the government what it wants in terms of investigative costs. I am tentatively inclined to believe that a *total* award of $4,000 for the costs of the investigation would be both fair and reasonable.

I urge counsel to negotiate a resolution of these two matters—damages and the costs of investigation. If they do, I am likely to adopt it.

IT IS ORDERED that:

1. Paul Kenner is found guilty beyond a reasonable doubt of the four counts alleged in the superseding information (Filing No. 15).

2. Counsel shall jointly confer with Kris Leininger, my judicial assistant, on or soon after February 28, 2017 (402-437-1640) to set a date, time, and place for sentencing.[13]

3. Mr. Kenner must attend the sentencing hearing.

February 28th, 2017.            BY THE COURT:
                                s/*Richard G. Kopf*
                                Senior United States District Judge

---

[13] To avoid unnecessary costs to the judiciary and to obviate the substantial effort it takes for my courtroom deputy, our IT person, our court security officers and our Deputy U.S. Marshals to travel and work in North Platte where we must borrow the courtroom of the state trial court, I would prefer that the sentencing take place in Lincoln, Nebraska. However, if Mr. Kenner insists on sentencing in North Platte, Nebraska that is his right and I will honor that request without rancor.